**UNIVERSITY EMERGENCY
MEDICINE FOUNDATION,**
Plaintiff, Appellee,

v.

**RAPIER INVESTMENTS, LTD and**
Medical Business Systems, Inc.,
Defendants, Appellants.

No. 99–1216.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1999.

Decided Nov. 30, 1999.

William R. Grimm, with whom Mark Bianchi and Hinckley, Allen & Snyder were on brief for appellants.

Charles S. Beal, with whom Cameron & Mittleman LLP were on brief for appellee.

Before Boudin, Circuit Judge, Bownes, Senior Circuit Judge, and Lipez, Circuit Judge.

LIPEZ, Circuit Judge.

Rapier Investments Ltd. ("Rapier") and Medical Business Systems, Inc., ("MBS") (collectively, the "appellants") appeal from the summary judgment entered in favor of plaintiff-appellee, University Emergency Medicine Foundation ("Emergency Medicine"), declaring effective Emergency Medicine's notice to terminate a service contract with appellants. This case calls upon us to decide whether notice of termination is effective pursuant to the law of Rhode Island[1] where: (1) the notice is mailed in advance of, but received after, the expiration of the contractual notice period; and (2) a separate contractual notice provision invites notice by mail to a certain address, but notice is sent to, and actually received by, the noticee at a different address. Because we agree with the trial court that such notice was effective, we affirm.

## I.

As this is an appeal from an entry of summary judgment, we recount the pertinent facts in the light most favorable to the non-moving party, the appellants. *See Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir.1997). Emergency Medicine is a non-profit Rhode Island corporation that provides physicians' services to emergency departments at several Rhode Island hospitals. Pursuant to a series of contracts spanning more than ten years, MBS, a subsidiary of Rapier, performed coding, billing, collection and accounts receivable services for Emergency Medicine.

On October 1, 1995, Emergency Medicine and Rapier executed a contract (the "Agreement") calling for MBS to service Emergency Medicine for one year, and further providing that

> this Agreement shall be automatically extended for additional one (1) year period [sic] ("additional terms") unless and until either party elects to terminate this Agreement as of the end of the initial term or any additional term by giving at least four (4) months written notice that it elects to have this Agreement terminated, without cause.

A separate paragraph entitled "Notices," (the "notice paragraph"), prescribes a method by which notice may be "effectively given":

> Any notices given pursuant to this Agreement shall be deemed to have been effectively given if sent by registered or certified mail to the party to whom the notice is directed at the address set forth for such party herein above or at such other address as such party may hereafter specify in a notice given in accordance with this paragraph.

The only addresses "set forth" in the Agreement are Rapier's principal office, 7 Wells Avenue, Newton, Massachusetts, and Emergency Medicine's principal place of business, 593 Eddy Street, Providence, Rhode Island.

During the contract's first year, neither party terminated, and it automatically renewed for an additional year, ending September 30, 1997. On Friday, May 30, 1997, Annamarie Monks of Emergency Medicine mailed two letters intended to notify Rapier that Emergency Medicine planned to terminate the Agreement before it renewed for a third year. She sent one letter certified mail to Alan Carr–Locke of Rapier at 1238 Chestnut Street, Newton, Massachusetts. Because the letter was incorrectly addressed, it was returned undelivered on June 10, at which point Emergency Medicine mailed the no-

1. Because we sit in diversity, Rhode Island common law governs this dispute. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where the law of Rhode Island is not clear, we apply the law to the facts at hand as would, in our estimation, a Rhode Island state court. *See Catex Vitol Gas, Inc. v. Wolfe*, 178 F.3d 572, 576–77 (1st Cir.1999).

tice to 7 Wells Avenue, Newton, Massachusetts. She sent the second letter certified mail to JoAnn Barato–Mills .of MBS, the employee who had negotiated and signed the Agreement on behalf of Rapier, at her place of business, 20 Altieri Way, Warwick, Rhode Island. Ms. Barato–Mills received the letter the following Monday, June 2, 1997.[2]

In the months following Emergency Medicine's notice of non-renewal, MBS continued to perform services under the Agreement. Meanwhile, Emergency Medicine solicited bids for a new service contract and, although MBS submitted a bid, Emergency Medicine awarded the new contract to a different service provider. MBS then asserted that, because Emergency Medicine's termination notice had been invalid, the Agreement had already extended automatically for an additional year, ending September 30, 1998.

Emergency Medicine filed a complaint seeking, inter alia, a declaration that its notice had effectively terminated the Agreement.[3] The parties filed cross-motions for summary judgment on the validity of the termination notice, and the trial court granted judgment in favor of Emergency Medicine. This appeal ensued.[4]

## II.

■ The Agreement entered into by Emergency Medicine and Rapier expressly reserved to either party the power to terminate the contract before it automatically renewed. Termination provisions are standard fare in modern contracts, *see* 1A *Corbin on Contracts,* § 265, at 531, and such provisions often require that the terminating party fulfill certain conditions before termination is effective, *see* 6 *Cor-*

*bin,* § 1266 at 55–56. Where "the power to terminate is a conditional power," termination is not effective until the party seeking termination can show that the condition has been fulfilled. *See id.* at 56. According to Rapier, Emergency Medicine did not fulfill the condition required for termination under the Agreement because it failed to provide Rapier with at least four months written notice. We are asked therefore to evaluate the effectiveness of Emergency Medicine's termination notice pursuant to the contract.

### A. The Mailbox Rule

■ The Agreement expressly conditions a party's right to terminate on that party "giving at least four (4) months written notice" to the other party. Where, as here, such "a condition is required by the agreement of the parties ... a rule of *strict compliance* traditionally applies." Farnsworth, *Contracts* § 8.3, at 571 (1990) (emphasis added). "Strict compliance" means that "[t]he notice to terminate, to be effective, must be given at the stipulated time." *Fred Mosher Grain, Inc. v. Kansas Co–op. Wheat Mktg. Ass'n,* 136 Kan. 269, 15 P.2d 421, 425 (1932); *see also* 6 *Corbin* § 1266, at 65–66 (where the contract expresses a time period for notice, it is presumed that "time is of the essence"). As one court cautioned more than seventy-five years ago, "[t]he difference of one day in the giving of notice is small, in one view, but it is the distance across a necessary boundary in relations under the contract, and must be taken as decisive, or there can be no boundary." *Brown Method Co. v. Ginsberg,* 153 Md. 414, 138 A. 402, 403–04 (1927). Accordingly, we must strictly en-

---

**2.** According to Ms. Monks, she also telephoned Ms. Barato–Mills on June 2, 1997, and notified her of Emergency Medicine's intent to terminate the Agreement. However, because the Agreement demands "written notice," and, in any case, the four-month notice period had expired by June 2, this telephone call was not relied upon by the trial court, and has no bearing on our decision.

**3.** Emergency Medicine filed its complaint in Rhode Island state court and Rapier and MBS removed to federal court based on diversity jurisdiction.

**4.** We review *de novo* the grant or denial of summary judgment. *See Fletcher v. Town of Clinton,* 196 F.3d 41, 48–49 (1st Cir.1999).

force the four-month notice period bargained for by Rapier and Emergency Medicine.

■ The Agreement, as extended by renewal for one additional year, was set to expire on September 30, 1997. Counting back exactly four months, the last day on which Emergency Medicine had the power to terminate was May 31, 1997.[5] Although Emergency Medicine *mailed* notice letters on May 30, these letters were not *received* until after the notice period had expired. Thus, the timeliness of Emergency Medicine's notice turns on whether notice of termination is effective upon mailing, or upon receipt.

At common law, the default rule—i.e., the rule that governs unless the parties contract for different terms—makes notice effective only upon receipt, not mailing. *See* 1A *Corbin* § 265, at 532 ("If the agreement merely provides that one party may terminate by giving notice, the notice will be effective only when received, and not when it is started by mail or otherwise."); *Kantrowitz v. Dairymen's League Co-op. Ass'n,* 272 A.D. 470, 71 N.Y.S.2d 821, 822 (N.Y.1947) ("[W]here a contract requires notice, but does not specify the manner in which the notice is to be given, the mere mailing of notice is not sufficient unless it is received within the time specified.").

■ However, the parties may override the default rule by contract. *See* 6 *Corbin* § 1266, at 65 ("The time and manner of exercising a power of termination may be specified in the contract...."). In particular, the parties may contract to permit notice by mail. If they do, notice becomes effective upon mailing pursuant to the time-honored "mailbox rule."[6] *See* 1 *Merrill on Notice* § 633 (1956); *Kantrowitz,* 71 N.Y.S.2d at 822; *cf. Larocque v. Rhode*

*Island Joint Reinsurance Ass'n,* 536 A.2d 529, 531 (R.I.1988) ("Where the [insurance] policy provides that cancellation may be effected by mailing notice, the general rule is that notification is fulfilled by proof of mailing.").

Here, the Agreement unquestionably authorizes notice by mail. The notice paragraph expressly invites notice "sent by registered or certified mail." This paragraph therefore triggers the "mailbox rule," making notice effective upon mailing. Accordingly, Emergency Medicine's notice letters, mailed on May 30, 1997, took effect on that date, and were timely under the Agreement's four-month notice period, which did not expire until May 31, unless the use of an address other than the one specified in the contract deprived Emergency Medicine of the benefit of the mailbox rule.

**B. The Mailing Address**

[5] The notice paragraph states that notice "shall be deemed to have been effectively given if sent ... *to the party to whom the notice is directed at the address set forth for such party herein above* or at such other address as such party may hereafter specify...." The address "set forth" in the Agreement was Rapier's principal office located at 7 Wells Avenue, Newton, Massachusetts. Emergency Medicine, however, mailed its May 30 notices to Rapier at an incorrect Massachusetts address and to MBS at a Rhode Island address.

The trial court concluded that the notice paragraph, written in ·non-exclusive language, only set forth one method by which notice could be "effectively given." *See University Emergency Med. Found. v. Rapier Inv., Ltd.,* No. 97–549–T, slip. op.

---

5. The appellants concede in their brief that the deadline for providing four months written notice did not expire until Saturday, May 31, putting to rest any question about whether four months from September 30 was May 30 or May 31.

6. The "mailbox rule" derives from the famous case, *Adams v. Lindsell,* 106 Eng. Rep. 250 (K.B.1818), which held that an offer was binding, and hence could no longer be revoked, once the offeree placed an acceptance in the mail. *See* Farnsworth, *Contracts* § 3.22, at 180–81.

at 4–5 (D.R.I. October 15, 1998) (order granting summary judgment). The court then noted that, as a general rule, notice given by a method different from the one provided for in the contract "is effective if it is actually received unless the method by which notice is given is an essential element of the transaction." *Id.* (citing 1 *Merrill*, § 603, at 662–63). Finding that Emergency Medicine's notice was actually received (and, impliedly, that the contractual method for providing notice was not an "essential element" of Rapier and Emergency Medicine's transaction), the court ruled that notice was effective. *See id.* at 6.

We accept the trial court's conclusion that the notice was effective, but disagree slightly with its underlying reasoning. Although the notice paragraph is non-exclusive, permitting notice in any other way recognized by law, Emergency Medicine *must* rely on the notice paragraph on the facts of this case because it is only this paragraph that invites notice by mail, and, consequently, as discussed above, it is only by virtue of this paragraph that Emergency Medicine's notice was timely. Because Emergency Medicine must rely on the notice paragraph as its authority for invoking the "mailbox rule," we must inquire whether Emergency Medicine's notice letters complied with the terms and conditions of valid notice under that paragraph.

In doing so, we are mindful of the principle, so fundamental in the law of contracts, that we must give effect to the intent of the parties. *See McCarthy v. Azure,* 22 F.3d 351, 355 (1st Cir.1994); *Brady v. Norwich Union Fire Ins. Soc.,* 47 R.I. 416, 133 A. 799, 799 (1926). Here, the critical question is whether the parties intended the use of the mailing address specified in the contract to be a condition precedent to valid termination. We conclude that they did not. Rather, we find that the parties identified specific addresses for the mailing of notice merely as a convenient means of ensuring timely delivery.[7]

First, we note the obvious difference in import of the four-month notice provision and the mailing address provision. A notice period reflects the amount of time deemed necessary by the parties to adapt to the other's termination. For the service provider, it includes the time needed to procure new clients or reallocate staff and equipment; for the service recipient, it includes the time needed to replace its former service provider. By contrast, the mailing address does not, in itself, confer any benefit upon either party. It is merely a collateral term intended to enhance the probability that mailed notice will arrive promptly in the proper hands. *Cf. Palo Alto Town & Country Village, Inc. v. BBTC Co.,* 11 Cal.3d 494, 113 Cal. Rptr. 705, 521 P.2d 1097, 1100 (1974) (in bank) (an option contract's provision that notice be given personally or by prepaid registered mail is a "mere suggestion of a permissive method of communication," not "a prescribed requirement or an absolute condition."). Thus, by its very nature, the stipulation that notice be sent to a particular address is not the type of term ordinarily bargained-for, nor is it the type of term intended to allow one party to extinguish the other's contractual rights based on a failure of strict compliance.[8] Indeed, courts have held that mailed termination notice is valid so long as it is *actually received* by the noticee, even where it is mailed to an incorrect address, *see U.S. Broad. Co. v. National Broad. Co.,* 439

---

7. This distinction—between terms intended as conditions, the non-occurrence of which prevents a party from exercising a right (or relieves the other party from a duty), and terms intended merely to enhance the convenience of the transaction—is well-recognized in the law of contracts. *See* Farnsworth, *Contracts* § 8.4, at 579–81.

8. We do not mean to suggest that parties could *never* require strict compliance with a mailing address. Rather, parties that desire stringent enforcement of an address to which termination notice is sent must state this intention clearly within their agreement.

F.Supp. 8, 9–10 (D.Mass.1977), or where the form of the mailing is technically defective, *see Southern Sanitation Co. v. City of Shreveport,* 308 So.2d 848, 849 (La. Ct.App.1975) (letter addressed incorrectly to "P.O. Box 3326" rather than "3328."); *Barbier v. Barry,* 345 S.W.2d 557, 562 (Tex.Civ.App.1961) (letter sent by regular rather than registered mail). *But see Prudential Carolinas Realty v. Cambridge Dev. Corp.,* 872 F.Supp. 256, 261 (D.S.C. 1994) *aff'd,* 42 F.3d 1386 (4th Cir.1994) (per curiam).

Second, the overall structure of the Agreement indicates that the parties did not intend the mailing address to be a condition of valid termination. *See Aneluca Assoc. v. Lombardi,* 620 A.2d 88, 92 (R.I.1993) (construing the parties' intent by looking to the contract as a whole). The paragraph of the Agreement delineating termination rights appears five pages before the paragraph describing "notice" by mail. The only conditions of termination expressed within the paragraph on termination rights are that notice be given in writing and at least four months in advance of the Agreement's year-end date. Moreover, as the trial court correctly found, the notice by mail paragraph is written in non-exclusive language, suggesting that any method of written notice valid under law would be effective. *See University Emergency Med. Found.,* No. 97–549–T, slip. op. at 4–5; *see also Southern Region Indus. Realty, Inc. v. Chattanooga Warehouse and Cold Storage Co.,* 612 S.W.2d 162, 164 (Tenn.1980) (finding that the contractual address "merely suggests a permitted place and method of giving notice and does not preclude sending notice to other offices. . . ."). If the parties had intended the use of the address specified in the contract to be a condition of valid termination, like the four-month notice period, they presumably would have located the address requirement next to the notice period in the paragraph defining termination rights. Moreover, if the address was an essential term of the bargain, the parties would have made notice sent to that address the exclusive means of providing written notice, rather than just one method among many that would have been effective. Thus, the overall structure of the Agreement supports our conclusion that the parties intended the mailing address as a convenient means of effectuating delivery and not as a condition precedent to valid termination.

To be sure, a party that fails to use the address identified in the contract for mailing notice risks losing the benefit of the mailbox rule. The contract provision at issue in this case, which states that notice of termination may be given effectively by registered or certified mail sent to a particular address, allocated the risk of nondelivery of a notice sent in strict compliance with the contract. *Cf. Worms v. Burgess,* 620 P.2d 455, 457 (Okla.Ct.App.1980) (observing that in the offer-acceptance context the mailbox rule shifts the risk of loss during transmission to the offeror); Farnsworth, *Contracts* § 3.22, at 184 ("The mailbox rule has been used to allocate the risk of transmission. . . ."). That is, if Emergency Medicine chose to give timely notice of termination by registered or certified mail sent to the specified address, and the notice was undelivered because of a failure by the postal service, Emergency Medicine would have still given timely notice of termination despite the non-delivery. *Cf. Restatement (Second) of Contracts* § 63 ("Unless an offer provides otherwise, . . . an acceptance made in a manner and by a medium invited by an offer is operative . . . without regard to whether it ever reaches the offeror. . . ."). If, however, Emergency Medicine directed its otherwise timely notice of termination to the *wrong address* and there were no delivery, Emergency Medicine would lose the benefit of the mailbox rule. In situations where there is delivery despite the use of a wrong address, and the circumstances indicate that the parties intended the address as merely a collateral term designed to enhance the timely delivery of notice, the continuing availability of the

mailbox rule to the sender requires an assessment of the particular facts of the case.

In the case at hand, Emergency Medicine risked losing the benefit of the mailbox rule with respect to both of its improperly addressed May 30 mailings. That risk arguably materialized in the case of the letter mailed to Rapier's Alan Carr–Locke, which was returned undelivered, and finally arrived at Rapier more than 10 days after it was originally sent. However, the letter mailed to MBS's JoAnn Barato–Mills arrived in her hands just one business day after it was mailed (the letter was mailed on Friday and arrived on Monday), within the ordinary time period expected for delivery by mail. Under these circumstances, Emergency Medicine retained the benefit of the mailbox rule despite the improper address, and this second letter placed Rapier on written notice of Emergency Medicine's intent to terminate the Agreement before it automatically renewed for a third year.[9] Therefore, we conclude that Emergency Medicine provided Rapier with four months written notice of its intent to terminate as required under the Agreement.

*Affirmed.*

---

9. The appellants suggest that notice received by Barato–Mills was defective because she worked for MBS rather than for Rapier. However, nowhere in their brief do the appellants directly contest the trial court's conclusion that "MBS had at least implied or apparent authority ... to accept the notice of termination of those services." Moreover, there are sufficient facts in the record to support the trial court's legal conclusion that Rapier cloaked Barato–Mills with the apparent authority to accept notice of termination. Such apparent authority could be inferred from Barato–Mills's negotiation and execution of the service contract on behalf of Rapier. *See Menard & Co. Masonry Bldg. Con-*

*tractors v. Marshall Bldg. Sys., Inc.,* 539 A.2d 523, 526 (R.I.1988) (negotiating and executing a subcontract evidence of apparent authority); *Empire Communications Consultants, Inc. v. Pay TV of Greater New York, Inc.,* 126 A.D.2d 598, 510 N.Y.S.2d 893, 896 (N.Y.App.Div.1987) (negotiating service agreement evidence of apparent authority to accept contractual termination notice); *Restatement (Second) of Agency* § 27 (1958); *cf. Davies v. Little,* 111 R.I. 496, 304 A.2d 661, 665 (1973) (where two corporations share the same interests and same governing bodies, notice sent to one is effective to notify the other).